1

```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF KENTUCKY
 2                      SOUTHERN DIVISION AT LONDON
                                  - - -
 3
        UNITED STATES OF AMERICA,      : Docket No. 21-cr-32
 4                                     :
                            Plaintiff, : London, Kentucky
 5                                     : Tuesday, June 22, 2021
                                       : 9:00 a.m.
 6      versus                         :
                                       :
 7      PATRICK BAKER,                 :
                                       :
 8                          Defendant. :

 9                                - - -
                        TRANSCRIPT OF DETENTION HEARING
10                       BEFORE CLARIA HORN BOOM
                        UNITED STATES DISTRICT COURT JUDGE
11                                - - -

12      APPEARANCES:

13      For the United States:      JENNA E. REED, ESQ.
                                    U.S. Attorney's Office
14                                  601 Meyers Baker Road
                                    Suite 200
15                                  London, KY 40741-3035

16      For the Defendant:         STEVEN R. ROMINES, ESQ.
                                   Romines, Weis & Young, PSC
17                                 600 West Main Street
                                   Suite 100
18                                 Louisville, KY 40202

19                                 PATRICK J. RENN, ESQ.
                                   600 West Main Street
20                                 Suite 100
                                   Louisville, KY 40202
21
        Court Reporter:           JOAN LAMPKE AVERDICK, RDR, CRR
22                                Official Court Reporter
                                  35 West Fifth Street
23                                Covington, KY 41011
                                  (859) 291-9666
24
            Proceedings recorded by mechanical stenography,
25      transcribed via computer-aided transcription.
```

1         (Proceedings commenced at 9:00 a.m.)

2              THE COURT:  Madam Clerk, can you please call the

3    case.

4              DEPUTY CLERK:  Yes, Your Honor.  It's London Criminal

5    Number 21-cr-32, United States of America versus Patrick

6    Baker.

7              THE COURT:  Counsel, can you please state your

8    appearances for the record.  First for the United States.

9              MS. REED:  Good morning, Your Honor.  Jenna Reed for

10   the United States.  And with me is FBI Task Force Officer Mark

11   Mefford.

12             THE COURT:  Good morning.

13        And on behalf of Mr. Baker?

14             MR. ROMINES:  Good morning, Your Honor.  Steven

15   Romines and Pat Renn on behalf of Patrick Baker.

16             THE COURT:  All right.  Good morning.

17         We're here for the limited purpose of addressing whether

18   or not the United States has met its threshold burden under

19   3142(f) for reopening the detention hearing and for hearing

20   evidence of pretrial compliance, specifically from an

21   ex-girlfriend of the defendant.

22        Has the United States fulfilled its obligation to notify

23   the victim's representatives of this hearing?

24             MS. REED:  Yes, Your Honor.

25             THE COURT:  And are there any present, and have they

1  made any requests?

2       MS. REED:  Not to me, Your Honor.

3       THE COURT:  All right.  Thank you.

4  On June the 8th, Judge Ingram, after holding a lengthy

5  detention hearing and receiving submissions from both parties,

6  entered an order finding that strict conditions of release

7  will sufficiently mitigate the evident danger risks in this

8  case; thus, he concluded, that the Bail Reform Act requires

9  release.

10  On June the 9th, the United States sought review of Judge

11  Ingram's order pursuant to Section 3145.  Thereafter, this

12  court ordered briefing on the matter, and the parties'

13  submissions are at Record Entries 27 and 28.

14  In the United States' objection to Judge Ingram's

15  findings, the United States also requested that the Court

16  reopen the evidentiary hearing pursuant to 3142(f)(2) on the

17  basis of newly discovered evidence obtained on June the 14th

18  of this year, previously unknown, that they argued bears on

19  the detention issues in this case; specifically, that an

20  ex-girlfriend, Dawn Turner, advised that the two abused

21  Oxycodone regularly during his period of pretrial release from

22  2014 to 2017.

23  Under 3142(f), a detention hearing may be reopened if the

24  Court finds that information exists that was not known to the

25  movant at the time of the original hearing and if it has a

material bearing on the issue of whether there are conditions that will reasonably assure the appearance of the defendant and the safety of any other person and the community.

This Court entered an order on June the 18th exercising its discretion to reopen the detention hearing for the limited purpose of (1) determining whether the United States has met this standard and (2) hearing evidence from Ms. Turner on the alleged pretrial violations and any evidence the defense had in response.

The Court's prior order found that the new evidence was potentially material; and in analyzing the first prong under 3142(f) -- that is, the threshold issue of whether the new information was not known to the movant, the United States -- adopted a complete lack of diligence standard.

Upon additional research, this Court is unsure that this is the correct standard or whether a higher standard is more appropriate, as outlined by a number of Sixth Circuit cases. The Court will require the parties to submit briefing on this issue by 5:00 this Thursday, June the 24th; that is, the standard for reopening the detention hearing.

Nevertheless, the Court will proceed with this evidentiary hearing; and if the Court ultimately rules that the United States has failed to meet this standard, the Court will strike the additional evidence that is presented today.

In preparation for this hearing, the Court has listened

to the entirety of the lengthy detention hearing held by Judge

Ingram.   The Court has reviewed the parties' post-hearing

submissions.   The Court has reviewed Judge Ingram's lengthy

and detailed findings and statements of reason for release.

The Court has reviewed the United States' objections to Judge

Ingram's order and the defendant's response.   And I have

reviewed the pretrial services report and addendum.

The Court will proceed with the hearing first on the

issue of whether this information was not known to the United

States.   Then the Court will reserve its ruling on that issue

to be informed by the parties' post-hearing briefs on the

appropriate legal standard and proceed with hearing the new

evidence and the defendant's response.   Such evidence, as I

mentioned previously, will be stricken if the Court finds that

the United States has failed to meet the threshold burden

under 3142(f) and that the evidence was not known.

Before hearing from the United States on the threshold

issue, the Court will point the parties to a number of Sixth

Circuit cases that have adopted a stricter standard than the

one cited by the Court in its previous order.

In particular, in *United States v. Bothra, 2019 Westlaw

8883664* -- it's a Sixth Circuit case from 2019 -- the Sixth

Circuit held, quote, "To reopen a proceeding, a defendant" --

actually, it's the movant.   In that particular case, it was

the defendant.   "To reopen a proceeding, a defendant must

1    first establish that the information was not previously known

2    to him.  This requires a showing of truly changed

3    circumstances or a significant event."

4         The Sixth Circuit cited to *United States v. Dillon, 938*

5    *F.2d 1412.*  That's a First Circuit case from 1991.  *United*

6    *States v. Hare, H-a-r-e, 873 F.2d 796.*  That's a Fifth Circuit

7    case from 1989.  And *U.S. v. Peralta, 849 F.2d 625.*  That's a

8    DC Circuit case from 1988.

9         And the Court further stated, "Thus, information is not

10   new if it could have been presented at the previous hearing."

11        The Court further points the parties to a 2020 Sixth

12   Circuit case, *United States v. Rolla* (phonetic) -- that's 2020

13   Westlaw 5758015 (6th Cir 2020) -- where the Court stated, "To

14   reopen a proceeding, a defendant, or movant, must first

15   establish that the information was not previously known to

16   him.  Courts interpret this requirement strictly, requiring a

17   showing of truly changed circumstances or a significant

18   event."

19        That Sixth Circuit case, likewise, cites to the *Dillon*

20   case, the *Hare* case, and the *Peralta* case.

21        So next, moving on from the standard -- and again, the

22   Court is requesting follow-up briefing by this Thursday at

23   5:00 limited to the standard for reopening the detention

24   hearing.

25        Next, the Court will hear brief evidence from the United

1     States on this threshold issue and any response from the

2     defense.  Then I'll hear any new evidence that the United

3     States wishes to offer and the defendant's response.

4     Depending on the time, I will then hear brief argument on

5     these two narrow issues.  I've reserved one hour for this

6     hearing, and I don't intend for it to go any longer than that.

7          At this time, Ms. Reed, you may proceed with presenting

8     evidence related to the United States' burden for reopening

9     this case, and specifically that the proffer or the evidence

10    that the United States wishes to present was not known or

11    available to the United States.

12               MS. REED:  Yes, Your Honor.  The government calls FBI

13    Task Force Officer Mark Mefford to the stand.

14                MARK MEFFORD, GOVERNMENT'S WITNESS, SWORN

15               THE COURT:  Good morning.

16               THE WITNESS:  Good morning.

17               THE COURT:  Just speak directly into the microphone

18    so everybody can hear your testimony and our court reporter

19    can take it down accurately.

20               THE WITNESS:  Okay.

21               THE COURT:  Thank you.  You may proceed.

22               MS. REED:  Thank you.

23                          DIRECT EXAMINATION

24    BY MS. REED:

25    Q.   Sir, where are you currently employed?

*Mefford - Direct*                                                                8

1    A.   I'm a task force officer for the FBI.

2    Q.   And have you participated in an interview with Dawn

3    Turner previously?

4    A.   Yes.

5    Q.   And you've also reviewed some records with relation to

6    Dawn Turner and the Patrick Baker case, correct?

7    A.   Yes.

8    Q.   How many interviews has Dawn Turner conducted with law

9    enforcement relating in any way to Patrick Baker?

10   A.   I'm aware of three.

11   Q.   And the first of which occurred in May 2014, correct?

12   A.   Yes.

13   Q.   Specifically, May 21st, 2014?

14   A.   Yes.

15   Q.   At that time, at that interview -- well, that interview

16   was conducted by Kentucky State Police detective Jason York,

17   correct?

18   A.   Yes.

19   Q.   And at the time that interview took place, had the

20   defendant ever been placed on home incarceration at that time?

21   A.   Not to my knowledge.

22   Q.   So again, May 21st, 2014, this is a week or two after the

23   murder in this case, correct?

24   A.   Yes.

25   Q.   And then there was a second interview conducted of

*Mefford - Direct*                                                                9

1    Ms. Turner; is that right?

2    A.   Yes.

3    Q.   And that was December 28th, 2020?

4    A.   Yes.

5    Q.   And did you participate in that interview?

6    A.   I did.

7    Q.   And was the sole purpose of that interview to discuss

8    Mr. Baker's pardon and a fundraiser that was conducted for

9    Mr. Baker?

10   A.   Yes.

11   Q.   Did you discuss the murder at all with Ms. Turner?

12   A.   No.

13   Q.   Did you discuss home incarceration with Ms. Turner?

14   A.   No.

15   Q.   Was there even a discussion with regard to drug use with

16   Ms. Turner?

17   A.   No.

18   Q.   And then finally, there was an interview conducted with

19   Ms. Turner on June 14th, 2021, correct?

20   A.   Yes.

21   Q.   And at that interview, SSA Tremaine with the ATF was also

22   present, correct?

23   A.   Yes.

24   Q.   And SSA Tremaine went through several topics before ever

25   talking about home incarceration; is that right?

*Mefford - Direct*                                                     10

1    A.   Yes.

2    Q.   Including asking Ms. Turner about Christopher Wagner?

3    A.   Yes.

4    Q.   Was that an accomplice in the murder?

5    A.   That's right.

6    Q.   And he also talked about drug use leading up to the

7    murder; is that right?

8    A.   Yes.

9    Q.   He talked about Ms. Turner's whereabouts after the murder

10   and a trip that the two went on following the murder; is that

11   right?

12   A.   Yes.

13   Q.   Ms. Turner provided Special Agent Tremaine a video of the

14   defendant shooting what we believe to be the murder weapon; is

15   that correct?

16            MR. ROMINES:  Objection, Your Honor.  This hearing, I

17   thought, was supposed to be limited to this sole issue

18   regarding this witness --

19            THE COURT:  I agree.  Your objection is sustained.

20   I'll strike that from the record.

21      You may proceed for the limited purpose of the issues

22   that I have outlined.

23            MS. REED:  Yes, Your Honor.

24   BY MS. REED:

25   Q.   A range of topics were discussed prior to ever getting

1    into anything with regards to home incarceration following the

2    murder; is that right?

3    A.   Yes.

4    Q.   Okay.  And there was some significant substance to those

5    before the topic of home incarceration was ever touched upon;

6    is that right?

7    A.   Correct.

8    Q.   Okay.  Toward the end, SSS Tremaine did ask about home

9    incarceration; is that right?

10   A.   Yes.

11   Q.   And where the defendant resided during that period of

12   home incarceration?

13   A.   Yes.

14   Q.   And that's when Ms. Turner disclosed that he resided with

15   her in Manchester, is that right, during a portion of it?

16   A.   Yes.

17   Q.   And that there was drug use during a portion of it; is

18   that right?

19   A.   Yes.

20   Q.   Okay.  Between the December 2020 interview and the June

21   2021 interview, had Ms. Turner moved and changed residences?

22   A.   She had.

23   Q.   Okay.  So you had to go to a different location for the

24   second one?

25   A.   Yes.

1  Q.   Okay.  Do you recall when you reached out to Ms. Turner

2  to arrange the June 2021 interview?

3  A.   I called her at Agent Tremaine's request the Thursday

4  before.  We interviewed her on a Monday, and I called her the

5  Thursday before.

6  Q.   Okay.  Was there any other contact made with her between

7  December 2020 and June 2021?

8  A.   No.

9  Q.   Okay.  Thank you.

10       MS. REED:  I have no additional questions, Your

11  Honor.

12       THE COURT:  Thank you.  You may cross-examine the

13  witness.

14       MR. ROMINES:  Your Honor, pursuant to 26.2, we would

15  request the recorded interview that Ms. Turner gave on 5/14 --

16  on May 21st of 2014.

17       THE COURT:  Has that been previously provided to the

18  defense?

19       MS. REED:  No, Your Honor.  The summary has been

20  provided from KSP, but this particular witness was not present

21  for the 2014 interview.  It would not be his statement.

22       THE COURT:  But I think there is a different issue,

23  which is has that been provided as part of the normal

24  discovery process?

25       MS. REED:  No, Your Honor.  We don't provide audio

1    recordings of interviews until we do Jencks Act material.

2         THE COURT:  All right.  I don't believe that that is

3    a statement of this witness because it's an interview of a

4    different witness, but I will look into the issue and whether

5    or not that is discoverable under Rule 16.

6         MR. ROMINES:  And, Judge, I think the issue is that

7    26.2, when the witness is called, then that makes all of

8    those -- all of those statements must be provided at that

9    time.

10         THE COURT:  Well, I guess we don't know whether or

11   not -- is the United States intending to call Ms. Turner?

12         MS. REED:  Yes, Your Honor.

13         THE COURT:  All right.  So is that statement going to

14   be provided then?

15         MS. REED:  Yes, Your Honor.

16         THE COURT:  And so does that mean we're going to have

17   to recess this hearing because they haven't been provided with

18   that interview?

19         MS. REED:  Your Honor, it's the government's

20   understanding that a transcript of that has been provided, a

21   24-page transcript, that's dated and time stamped; but the

22   audio recording has not previously been provided, that is

23   correct.

24         THE COURT:  Okay.  So do you have a transcript from

25   that interview?

1        MR. RENN:  No, Your Honor.

2        MR. ROMINES:  No, we do not, Your Honor.

3        THE COURT:  I'm going to ask the United States just

4    to take a look.  And defense counsel, if you could please

5    review your discovery.

6        MR. RENN:  Your Honor, we were provided with a hard

7    drive of discovery, and I do not recall ever seeing that.

8    There is the one reference to the summary transcript from the

9    report of investigation of the agent.  It's a two- or

10   three-page.  I have not seen that transcript.  If it's on

11   there, again, it would be my apologies, but I've certainly

12   looked.

13       MR. ROMINES:  Your Honor, in preparation for this

14   hearing, I went through the discovery looking for anything

15   related to Dawn Turner because she might be a witness.  I did

16   not -- I could not find this.  I did find the summary of it;

17   but I did not find, in the discovery, this interview, this

18   transcript.

19       THE COURT:  All right.

20       MR. ROMINES:  Now, Judge, it's several thousand

21   pages.  It is possible that it is in there, but I reviewed the

22   discovery specifically for anything related to Dawn Turner,

23   and this was not part of it.

24       THE COURT:  Okay.  Here's what we're going to do.

25   We're going to go ahead and proceed.  It's certainly not a

1    statement of this witness so we're going to proceed with the

2    cross-examination.

3         If need be then, we'll take a brief recess to allow,

4    number one, the United States to confirm that it provided that

5    statement and, number two, I believe you've just been provided

6    with a hard copy of it.  If not, I'll ask the United States to

7    provide that, and I'll give you ten minutes to review that

8    previous statement.

9         So let's proceed with the cross-examination of this

10   witness.

11             MR. ROMINES:  Thank you, Judge.

12             THE COURT:  Okay.

13                          CROSS-EXAMINATION

14   BY MR. ROMINES:

15   Q.   Agent Mefford, when -- you participated in the interview

16   of 12/28/20 of Ms. Turner?

17   A.   That was 12/9/20.

18   Q.   Okay.  You did not participate in the initial interview

19   in May of 2014; is that correct?

20   A.   No, I did not.

21   Q.   Who else participated in the December of 2020 interview

22   of Ms. Turner?

23   A.   FBI agent Jim Huggins, FBI forensic accountant Chris

24   Darman, myself, and Kentucky Attorney General investigator

25   Matt Easter.

1    Q.   Okay.  And I understand that you indicated that that was

2    the focus -- the focus of that interview was a fundraiser?

3    A.   Yes.

4    Q.   And you did not ask any questions about the murder or

5    HIP?

6    A.   That's right.

7    Q.   However --

8    A.   Repeat the last part.  Or?

9    Q.   Or any violations or drug use while Mr. Baker --

10   A.   Right.  We did not --

11              THE COURT:  Hold on.  Let him finish his question

12   before you answer.  Thank you.

13   BY MR. ROMINES:

14   Q.   Now, Ms. Turner didn't decline to answer any questions at

15   that time, did she?

16   A.   No.

17   Q.   All right.  So had you asked any questions about the

18   murder, she would have answered them?

19   A.   I can't -- I can't say whether she would have or not.

20   Q.   Well, did she decline to answer any when you interviewed

21   her --

22   A.   No.

23              THE COURT:  Let him finish his question before you

24   state your answer.  Thank you.

25   BY MR. ROMINES:

1   Q.   Did she decline to answer any questions when she was
2   interviewed a week ago?
3   A.   No.
4   Q.   All right.  Did she decline to answer any questions,
5   based on your review of the file, when she was interviewed in
6   May of 2014?
7   A.   No.
8   Q.   So she's never declined to answer any questions posed to
9   her, correct?
10  A.   Correct.
11  Q.   So if you had asked her any questions about the murder in
12  December of 2020, she would have answered them?
13  A.   Yes.
14  Q.   Okay.  And if you'd asked her any questions about Patrick
15  Baker's bond violations while on HIP, she would have answered
16  them?
17  A.   Yes.
18  Q.   They just weren't asked?
19  A.   Yes.
20  Q.   Okay.  And then how did it -- you indicated that you
21  called on the Thursday before you interviewed her on 6/14?
22  A.   Yes.
23  Q.   What time did you interview her?
24  A.   It was in the morning.  I think 10:00 in the morning.
25  Q.   Okay.  And how long did it take?

1    A.   I think a little less than an hour.

2    Q.   Okay.  Did you take notes, transcribe it, you know, call

3    Ms. Reed about what she had said?

4         How was that information conveyed?

5    A.   That was conveyed by Agent Tremaine.

6    Q.   Okay.  Were you present when Agent Tremaine conveyed it?

7    A.   No.

8    Q.   All right.  Did you all ride back together?

9    A.   I picked him up at the ATF office and dropped him back

10   off at the ATF office.

11   Q.   Okay.  So you all were done with this interview at

12   approximately 11 a.m.?

13   A.   Estimated, yes.

14   Q.   And where was it conducted?

15   A.   Here in London.

16   Q.   Okay.  And then you went back to your FBI office, and

17   then he went -- do you know where he went?

18   A.   I just dropped him off at the ATF office.  I don't know

19   where he went after that.

20   Q.   Did you have any conversations with Ms. Reed about that

21   interview?

22   A.   No.

23   Q.   Okay.  Never had any?

24   A.   Not until we talked about today's hearing in the last few

25   days.

1  Q.   And at that time, during that interview, Agent Tremaine
2  specifically asked questions about HIP?
3  A.   I know you just answered, but tell me HIP again.
4  Q.   Home incarceration.
5  A.   He asked more about drug use, and she volunteered that
6  he'd done so after his release in 2015.
7  Q.   When you called her on the 10th to set it up, why did you
8  call her up?  Have you called every witness since this
9  detention hearing?
10 A.   No.  This is the only one.  Agent Tremaine told me that
11 he'd like to interview her, and I told him that I'd
12 interviewed her in the past and thought I could get ahold of
13 her via telephone and asked him if he wanted her phone number
14 or if he would like me to call her, and he asked me to call
15 her, which I did.
16 Q.   Okay.  And did he say why he wanted to interview her?
17 A.   No.
18 Q.   And so on each interview she's given, she answered every
19 question that was put to her; never declined to answer any
20 questions?
21 A.   Yes.
22 Q.   And was never asked any questions about Patrick Baker
23 violating any conditions of bond or any drug use while on bond
24 at any time by law enforcement?
25 A.   Yes.

1  Q.   Including prior to the detention hearing, which was

2  conducted in this case the first of June?  First week of June.

3  A.   Yes.

4  Q.   And have you reviewed the summary of Ms. Turner's May

5  2014 interview with KSP?

6  A.   I've reviewed the summary.

7  Q.   Okay.  And have you reviewed the summary of the interview

8  that was conducted by you and Agent Tremaine?

9  A.   Yes.

10  Q.   What is the difference between those two interviews?

11  A.   First interview was more open-ended.  I think they

12  weren't sure about a lot of facts.  The second one is more

13  pointed, more facts being known.

14  Q.   Okay.  The evidence that is provided or the testimony

15  provided is almost exactly the same in each interview, in each

16  summary, isn't it?

17  A.   Yes, similar.

18  Q.   Yeah.  The only difference between her interview of

19  May 21, 2014 and June 14th of 2021 is the questions about HIP

20  or drug use while on HIP, correct?

21  A.   Yes.

22  Q.   And so nothing she said was any different between the

23  first interview and the interview that was conducted after the

24  detention hearing, correct?

25  A.   Well, the second interview deals more specifically with

1    drug use after his release.

2    Q.   Correct.  So the focus of that interview and the purpose

3    of interviewing her was to inquire about drug use after his

4    release, correct?

5    A.   No, not specifically.  It was an open-ended interview

6    about the murder, the weapons involved in the murder, and drug

7    use.

8    Q.   Okay.  Well, everything that she was asked, she had

9    already been asked, correct?

10   A.   Generally, yes.

11   Q.   And she had answered it basically exactly the same?

12   A.   Yes.

13   Q.   Right.  And she's the only witness that went to be

14   interviewed by you guys, at Agent Tremaine's request,

15   following the detention hearing, correct?

16   A.   I do not know of any other interviews that might have

17   been done.

18   Q.   Okay.  So the only witness that you guys bothered to go

19   talk to specifically was somebody that had already been

20   interviewed, every question asked and answered, but you all

21   then specifically asked her about drug use while he was on

22   bond, correct?

23   A.   Again, there may have been other interviews that I'm not

24   familiar with.

25   Q.   Okay.  It's the only one you're aware of, correct?

1   A.   Yes.

2   Q.   Is it the only one you participated in?

3   A.   Yes.

4   Q.   And again, none of these -- you didn't ask her any of

5   these questions when you interviewed her in December of 2020?

6   A.   That's correct.

7   Q.   All right.  Did Agent Tremaine advise why he wanted to

8   speak to -- interview Ms. Turner?

9   A.   No.

10  Q.   Did he advise that the day before, the judge had ordered

11  a briefing schedule or had ordered Patrick Baker released and

12  that's why he wanted to interview Ms. Turner?

13  A.   No, he did not tell me that.

14  Q.   Did he advise Ms. Turner, during that interview, that

15  Patrick Baker had been ordered released?

16  A.   I do not remember it coming up.

17  Q.   And that if he had violated bond conditions while on HIP

18  or used drugs, that that might not allow him to be released?

19  A.   No, he did not say that.

20  Q.   None of that came up?

21  A.   No.

22  Q.   How exactly did HIP and bond conditions and drug use come

23  up?

24  A.   Agent Tremaine asked about drug use, Patrick Baker's drug

25  use.

1    Q.    Okay.  Was the interview in connection to the homicide?

2    A.    Yes.

3    Q.    Okay.  Now, the homicide occurred in 2014, correct?

4    A.    Yes.

5    Q.    All right.  Patrick Baker's drug use that Ms. Turner

6    talks about was allegedly after the murder, correct?

7    A.    Yes.

8    Q.    Okay.  So that didn't have anything to do with the

9    murder, did it?

10   A.    No.

11   Q.    Everything she talked about, she had previously said

12   related to the murder?

13   A.    Generally, yes.

14   Q.    And then he specifically asked her -- went to interview

15   her and specifically asked her questions about drug use after

16   the murder that had no relation to the murder, correct?

17   A.    I think questions about drug use in general, and she

18   offered that he had used drugs after his release.

19   Q.    So she just volunteered that?

20   A.    Yes.

21   Q.    And did he ask specifically -- was that interview

22   recorded?

23   A.    No.

24   Q.    Did he ask specifically about drug use after he was

25   released?

1  A.   When she stated that he was using after his release, he

2  followed that line of questioning.

3  Q.   Okay.  And that's the only line of questioning that was

4  different than and hadn't already been covered by KSP in her

5  initial interview?

6  A.   Generally.

7  Q.   Now, are you aware if Ms. Turner was available to be

8  called as a witness on the detention hearing initially?

9  A.   I didn't know there was going to be a second detention

10  hearing so I'm probably not aware of that.

11  Q.   I'm talking about on June 4th.  Ms. Turner could have

12  been called at that detention hearing.

13  A.   I was not included in those discussions.

14  Q.   Did she advise she was out of town or unavailable?

15  A.   No.

16  Q.   Okay.  So she could have been called at the detention

17  hearing?

18  A.   Yes.

19  Q.   And if questioned, was there any drug use while he was on

20  bond, she would have presumably answered the same way,

21  correct?

22  A.   Presumably.

23  Q.   All right.  But nobody bothered to call her, to your

24  knowledge, correct?

25  A.   Correct.

1    Q.   Did she advise if she'd ever heard from anybody from the

2    government since you last talked to her in December of 2020?

3    A.   She did not advise as such.

4    Q.   Okay.  The next call she got regarding this was when you

5    reached out to her the day after the judge ordered a briefing

6    schedule?

7    A.   Yes.  On that Thursday.  I don't know when the briefing

8    was scheduled.

9    Q.   Okay.

10            MR. ROMINES:  Thank you.  That's all.

11            THE COURT:  Any redirect?

12            MS. REED:  No, Your Honor.

13            THE COURT:  I've got a couple of questions.

14       Is it Task Force Officer Mefford?

15            THE WITNESS:  Mefford, M-e-f-f-o-r-d.

16            THE COURT:  Okay.  M-e-f-f-o-r-d.

17       What steps did the United States take, prior to the

18   detention hearing on June the 4th, to determine the

19   defendant's pretrial compliance in 2014 through 2017?

20            THE WITNESS:  I was not aware of any discussion

21   involving that.  I only interviewed Dawn Turner as part of

22   this investigation.

23            THE COURT:  Okay.  So you were not directed to -- you

24   did not take any steps to determine the defendant's pretrial

25   compliance from 2014 to 2017, in advance of the original

1    detention hearing?

2            THE WITNESS:  Correct.

3            THE COURT:  All right.  You're not aware of any

4    efforts to interview her, prior to the original detention

5    hearing, after the December 2020 interview; is that correct?

6            THE WITNESS:  Correct.

7            THE COURT:  I have no further questions.

8            MR. ROMINES:  Nothing further.

9            THE COURT:  All right.  May this witness be excused?

10           MS. REED:  Yes, Your Honor.

11           THE COURT:  All right.  Any other witnesses on this

12   issue?

13           MS. REED:  Your Honor, I would like to enter the

14   three prior interviews as exhibits.

15           THE COURT:  The three prior interviews of Ms. Turner?

16           MS. REED:  Yes, Your Honor.

17           THE COURT:  All right.

18           MS. REED:  I am providing the defense a copy of

19   the -- this is the December 2021 *(sic),* and they were

20   previously -- with regards to the pardon and the fundraiser is

21   the only one they should not previously have been provided.

22           THE COURT:  All right.  I have a couple of questions,

23   Ms. Reed, specifically for you.

24       What steps did the United States take, prior to the

25   detention hearing on June the 4th, to determine the

1     defendant's pretrial compliance from 2014 to 2017?

2              MS. REED:  Yes, Your Honor.  There was a discussion

3     with the Probation Office with regards if there was any prior

4     incidents.  I think that was also put into the U.S. Probation

5     Office's report, in the bond report that the parties received.

6              Additionally, my understanding is that SSA Tremaine spoke

7     with Jackie Steele, who was the original prosecutor in the

8     state case, who relayed that there was no bond violation.

9              I also reviewed the 2017 presentence report, which did

10    not note any bond violations or positive drug urinalysis.

11             I reviewed two drug urinalysis reports.  Both were dated

12    pre-Christmas 2014, I want to say.  They were almost

13    immediately -- there was a period of incarceration, he was

14    released, and then there was another period of home

15    incarceration.  And so those two reports all predated the

16    Christmas timeframe when Ms. Turner ultimately said the drug

17    use began with the two of them.

18             There was no attempt --

19             THE COURT:  I presume those drug tests were negative

20    for any type of controlled substance?

21             MS. REED:  Correct.  The two that I saw were both

22    negative, Your Honor.

23             THE COURT:  So was there any effort to interview

24    anyone concerning his compliance with pretrial release during

25    the time frame of 2014 through 2017?

1    MS. REED:  I did not interview anyone nor direct

2    anyone to interview anyone other than the parties that I just

3    mentioned that I personally spoke to and the documents that I

4    reviewed.

5        THE COURT:  Obviously, the United States was aware of

6    Ms. Turner because she had been interviewed in 2014.  She'd

7    been interviewed also as part of this investigation in

8    December of 2020, correct?

9        MS. REED:  Not this investigation, Your Honor.  A

10   different agency, a different federal agency and a different

11   AUSA, is heading an ongoing investigation.  And so she was not

12   interviewed as part of mine or SSA Tremaine's investigation

13   into the murder, but she was interviewed by the government

14   with regards to a different investigation.

15       THE COURT:  She was interviewed by whom in December

16   of 2020?

17       MS. REED:  By the FBI.

18       THE COURT:  Okay.  And you had that information,

19   though, prior to the detention hearing?

20       MS. REED:  My office had it.  I personally did not

21   have it because it's an ongoing investigation and I am not the

22   assigned counsel.  But our office did have that interview in

23   its possession.

24       THE COURT:  Okay.  Agent Tremaine said that he'd been

25   investigating this case for a year.  Is that correct?

MS. REED:  Yes.  In reviewing the state's case, there was an agreement that SSA Tremaine would not approach anyone with regards to the murder investigation until the defendant was in custody because there was a fear that he could potentially flee if he knew that he was going to face federal charges post-pardon.

The only witnesses that he was allowed to interview were the two that were incarcerated and provided federal defense counsel, who advised them.  Now, that obviously changed when Mr. Baker was arrested, which obviously predates the detention hearing.

THE COURT:  All right.  So at this time, let me ask defense counsel -- those are all the questions that I have right now.

Do you need a break to review the statement of Ms. Turner before we head into the evidentiary part of this hearing?

MR. ROMINES:  No, Your Honor.  We're ready.

THE COURT:  All right.  So we're going to move on to hearing the new evidence that is going to be presented by the United States, subject to the Court's ultimate ruling on whether or not the United States has met its burden to reopen the detention hearing.

So Ms. Reed, you may call your next witness.

MS. REED:  Yes, Your Honor.  The government calls Dawn Turner to the stand.

1              DAWN TURNER, GOVERNMENT'S WITNESS, SWORN

2              THE COURT:  Good morning.

3              THE WITNESS:  Good morning.

4              THE COURT:  Please make sure you speak directly into

5    the microphone so everyone can hear your testimony and our

6    court reporter can record it accurately.  Thank you.

7         You may proceed.

8              MS. REED:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MS. REED:

11   Q.  Ma'am, do you know the defendant in this case, Patrick

12   Baker?

13   A.  Yes.

14   Q.  And how do you know him?

15   A.  We were in a relationship.

16   Q.  Okay.  And when did you first meet Mr. Baker,

17   approximately?

18   A.  I think initially in 1999, in college.

19   Q.  Okay.  And do you recall when you dated most recently?

20   A.  We got back together in November of 2013.

21   Q.  And are you still together?

22   A.  No.

23   Q.  And when did the relationship end, approximately?

24   A.  July 2019.

25   Q.  Okay.  I want to talk to you about a period in the winter

1   of 2014, approximately November 2014.

2       Was Mr. Baker facing state murder charges at that time?

3   A.   Yes.

4   Q.   And was he released on home incarceration for a period of

5   time?

6   A.   Initially, yes.

7   Q.   Okay.  And can you tell me what you mean by that,

8   initially?

9   A.   He was on home incarceration when he was first -- he was

10  arrested in May, and then he was released in June; and he was

11  on house arrest from June until July when he went back to

12  jail.

13  Q.   Okay.  So he went back to jail in the late summer of '14;

14  is that right?

15  A.   Yes.

16  Q.   And then he was released again, correct?

17  A.   Yes.

18  Q.   And the second time he was released, where did he reside?

19  A.   With me at my apartment.

20  Q.   Okay.  And how long did this continue?  How long did he

21  reside with you?

22  A.   Until the trial, until he went to jail.

23  Q.   Was that approximately 2017?

24  A.   Yes.  November of 2017.

25  Q.   Okay.  While he resided with you in your apartment in

1    2014 through 2017, did you ever witness any drug use on the

2    part of Mr. Baker?

3    A.   Yes.

4    Q.   And can you please explain to the Court how that began?

5    A.   I really can't remember how the day -- I don't remember

6    how it even came out.  We were getting ready to leave, and I

7    can't remember, but he had two blue pills, which were Oxy

8    pills; and then I ended up doing half of that Oxy, and he did

9    the rest.

10    Q.   Okay.  And when was this?  You said you were getting

11    ready to leave.  Leave to go where?

12    A.   We were actually going to go Christmas shopping toward

13    Louisville.

14    Q.   Okay.  So this is late November/early Decemberish 2014?

15    A.   Yes.

16    Q.   And was that the only time that you used Oxycodone with

17    Mr. Baker?

18    A.   No.

19    Q.   How did it progress from there?

20    A.   It just gradually increased into basically a full

21    addiction.

22    Q.   And how often were you using, with Mr. Baker, Oxycodone?

23    A.   Daily for the most part.

24    Q.   And were you employed during this period of time?

25    A.   Yes.

1  Q.   And where were you employed?

2  A.   The Department of Community Based Services.

3  Q.   And did you help finance the purchase of Oxycodone pills?

4  A.   Yes.

5  Q.   Did Mr. Baker also help finance the purchase of Oxycodone

6  pills?

7  A.   Yes.

8  Q.   And how did he do that?

9  A.   He received money from his parents.  I think he was doing

10  odd jobs at the lot.

11  Q.   Okay.  The lot he was working at at the time?

12  A.   Yes.

13  Q.   Do you remember the name?

14  A.   At Clayton Mobile Homes.

15  Q.   Okay.  You said it turned into a full-blown addiction.

16       Were you, yourself, addicted?

17  A.   Yes.

18  Q.   What happened when you didn't have the funds to purchase

19  Oxycodone pills?

20  A.   We would fall back on Suboxone and use that to hold us

21  over.

22  Q.   When you say "we," are you referring to Mr. Baker?

23  A.   Yes.

24  Q.   Now, Mr. Baker was incarcerated in 2017, correct?

25  A.   Yes.

1   Q.   And were you still addicted at the time that he was

2   incarcerated?

3   A.   Yes.

4   Q.   Did you continue to use through 2019?

5   A.   Yes.

6   Q.   Did you ever get clean or go to rehab?

7   A.   Yes.  September is when it started.  Then October is when

8   I was officially free of everything.

9   Q.   Of 2019?

10  A.   Yes.

11  Q.   Okay.  And are you sober currently?

12  A.   Yes.

13         MS. REED:  Thank you.  I have no additional

14  questions, Your Honor.

15         THE COURT:  All right.  The defense may cross-examine

16  this witness.

17         MR. ROMINES:  Yes, Your Honor.

18         MS. REED:  I have the audio.  Obviously, defense has

19  a transcript, but they now also have the audio with regards to

20  the 2014 interview.

21         MR. ROMINES:  That's fine, Your Honor.

22         THE COURT:  You may proceed.

23                        CROSS-EXAMINATION

24  BY MR. ROMINES:

25  Q.   All right.  Ms. Turner, my name is Steve Romines.  If I

1      ask you anything you don't understand, just ask me to rephrase

2      it.  Okay?

3      A.   Okay.

4      Q.   You live in London, Kentucky, right?

5      A.   Yes.

6      Q.   Were you in London, Kentucky the end of May this year?

7      A.   Yes.

8      Q.   Go on any trips out of town, anything like that?

9      A.   No, I don't think so.

10     Q.   Okay.  So from May 27th to June 4th, that seven days, you

11     were here in London, correct?

12     A.   Yes.

13     Q.   And you were here in London on June 4th of this year,

14     weren't you?

15     A.   Yes.

16     Q.   You were available to appear in court and testify like

17     you are today, weren't you?

18     A.   What?

19     Q.   If someone had called you to testify, you would have

20     showed up and testified?

21     A.   Yes.

22     Q.   All right.  And it's like when Agent Mefford called you

23     to come and interview you -- when did that happen?

24     A.   I don't remember the date.

25     Q.   Okay.  Do you remember what time he came by to see you?

1    A.   It was Monday at like 10 a.m.

2    Q.   Okay.  And you all talked for about an hour or so?

3    A.   Yes.

4    Q.   Okay.  Now, did they specifically ask you about Patrick's

5    drug use while on HIP?

6    A.   Yes.

7    Q.   Okay.  So they specifically inquired of you about that?

8    A.   Yes.

9    Q.   And you told them the truth?

10   A.   Yes.

11   Q.   Now, you would have told them the same thing had they

12   asked you that the last week of May.  If someone had called

13   you up and asked you those questions, you would have told them

14   the same thing, correct?

15   A.   Yes.

16   Q.   And if you'd have been called to testify at the hearing

17   on June 4th, you would have said the same thing?

18   A.   Yes.

19   Q.   Now, did they advise you, when you were talking about the

20   timeline of this drug use, that Patrick had multiple negative

21   drug tests while he was on bond in the previous case?

22   A.   I don't know the drug screens, no.

23   Q.   Okay.  Did they tell you the dates that he had had

24   negative drug screens?

25   A.   No.

1   Q.   Okay.  So the dates that you picked out of December to

2   when his trial went, those were just the dates that you --

3   that's what your testimony is, correct?

4   A.   Yes.

5   Q.   Now, are you aware that he had -- he was being drug

6   tested while on bond in that case?

7   A.   I just knew of one where they came into the apartment and

8   tested him.  And then I think he was tested at one point when

9   he was in jail.  Those were the only two that I'd actually

10  heard about.

11  Q.   Okay.  So were you at the apartment when they came and

12  drug tested him?

13  A.   Yes.

14  Q.   And that was when?

15  A.   That would have been between the first when he got out,

16  between June and July, that month.

17  Q.   Okay.  So did they call him up and advise they were

18  coming by?

19  A.   No.

20  Q.   Okay.  They just showed up and drug tested him?

21  A.   Um-hmm.  Yes.

22  Q.   And he tested negative?

23  A.   Yes.

24  Q.   And so he was aware that, at any time while he was on

25  bond in that case, they could show up and drug test him?

1    A.    Yes.

2    Q.    And if he tested positive, he would go back into custody?

3    A.    Yes.

4    Q.    At any time in that three-year period of time, they could

5    show up, test him; and if he tested positive, he would go back

6    into custody?

7    A.    Yes.

8    Q.    And he never went back into custody, did he?

9    A.    No.

10   Q.    And when the FBI and ATF called you, I guess last week or

11   two weeks ago, the Friday before they interviewed you on the

12   14th, did they tell you what they were wanting to talk about?

13   A.    Yes.

14   Q.    And it was about Patrick using drugs while on bond,

15   correct?

16   A.    They didn't say that in the phone call, no.

17   Q.    Okay.  But when they interviewed you, they specifically

18   said they wanted to talk about that?

19   A.    Yes.

20   Q.    Because he had been ordered released, and if he used

21   controlled substances while on bond, he might not get

22   released, correct?

23   A.    Yes.

24   Q.    And that's what they wanted you to testify to?

25   A.    Yes.

1          MR. ROMINES:  That's all I have, Your Honor.

2          THE COURT:  All right.  Any redirect?

3          MS. REED:  Yes, Your Honor.

4                      REDIRECT EXAMINATION

5    BY MS. REED:

6    Q.   Ma'am, when you were interviewed in June of 2021, most

7    recently, did Special Agent Tremaine and Task Force Officer

8    Mefford talk to you about 2014, the events that occurred?

9    A.   Yes.

10   Q.   And did you talk about when you had seen Patrick

11   following the murder and then your trip to South Carolina?

12   A.   Yes.

13   Q.   Did you provide them anything that you hadn't previously

14   provided the State?

15   A.   I think I had already -- they'd already seen a video that

16   I had on my phone.  I can't remember.

17   Q.   You provided video and photographs from your phone,

18   correct?

19   A.   Yes.

20   Q.   And what was in the videos and photographs that you

21   provided?

22   A.   A gun.

23   Q.   And who was shooting the firearm?

24               THE COURT:  Is this the same line of questioning that

25   I already sustained an objection on?

1    MR. ROMINES:  Yes, Your Honor.

2    MS. REED:  Yes, Your Honor, but I guess I'm trying to

3    pull out the fact that Special Agent Tremaine and Task Force

4    Officer Mefford specifically asked questions and collected

5    evidence with regards to the 2014 murder, not just

6    specifically with regards to the home incarceration period.

7    THE COURT:  Okay.  Then you can ask her if they asked

8    about the substantive offense and for any additional evidence

9    related to the substantive offense.

10   MS. REED:  Okay.

11   BY MS. REED:

12   Q.   Ma'am, did they ask you about the 2014 murder?

13   A.   Yes.

14   Q.   Did you provide them videos and photographs related to

15   the 2014 murder?

16   A.   Yes.

17   MS. REED:  I have no additional questions, Your

18   Honor.

19   MR. ROMINES:  I have a couple, Your Honor.

20   THE COURT:  All right.  You may recross.

21   MR. ROMINES:  May I approach the witness, Judge?  I

22   don't know how we're doing it in COVID days.  I've got a

23   question from her interview that was provided in connection to

24   what was just asked.

25   THE COURT:  Yes, you may.

1              MR. ROMINES:  All right.

2                           RECROSS-EXAMINATION

3    BY MR. ROMINES:

4    Q.   Ms. Turner, I'm showing you page 14, line 23, of your

5    interview that was conducted back in May of 2014 with the KSP.

6         The photographs and videos that you were just talking

7    about providing Agent Mefford and Agent Tremaine you had

8    already given KSP seven years ago, correct?

9    A.   Yes.

10             THE COURT:  I'm going to ask you to remain at the

11   podium.

12             MR. ROMINES:  Yes, Your Honor.

13   BY MR. ROMINES:

14   Q.   You had already provided all of this information to the

15   investigators seven years prior?

16   A.   Yes.

17   Q.   So there was nothing that you gave them, when you were

18   interviewed on 6/14, that you hadn't already given them?

19   A.   No.

20   Q.   Other than them specifically coming to talk to you about

21   whether or not Patrick had violated the conditions of his bond

22   by using drugs?

23   A.   Right.

24   Q.   Now I am showing you what has been marked as Defendant's

25   Exhibit 1.

1       What is that?

2    A.   My letter to the governor supporting Patrick's

3    application for pardon.

4    Q.   And what's the date of it?

5    A.   July 4th of 2018.

6    Q.   Okay.  And this is presumably after this three-year,

7    two-and-a-half period of time that we're talking about of you

8    all using drugs while he was on bond?

9    A.   Yes.

10   Q.   Now, which you would know to have been a bond violation

11   if it occurred?

12   A.   Yes.

13   Q.   All right.  Now, throughout this letter, you continued to

14   talk about just what a wonderful person Patrick is, correct?

15   A.   Yes.

16   Q.   And what an honest person he is and what a wonderful

17   surrogate father he had been to your children?

18   A.   Yes.

19   Q.   All of these things.  And all of those were true, weren't

20   they?

21   A.   Yes.

22   Q.   That's why you're telling the governor that in support of

23   his request for a pardon, is because he had been a wonderful

24   person to you?

25   A.   Yes.

1    Q.   And he had been a wonderful surrogate father to you?

2    A.   Yes.

3    Q.   And you subsequently lost your job after Patrick went to

4    jail, correct?

5    A.   I quit my job.

6    Q.   You quit your job.

7         Did you also lose or temporarily lose custody of one of

8    your children?

9    A.   Yes.

10   Q.   Okay.  What was that as a result of?

11   A.   A report was made to Social Services that I had been

12   using drugs.

13   Q.   Okay.  And so your child was temporarily removed from

14   you?

15   A.   Technically on paper, but we were allowed to live with my

16   aunt under direct supervision so he never left me.

17   Q.   So that never occurred while Patrick was living with you,

18   correct?

19   A.   Right.

20   Q.   All right.  There were no problems in that regard?

21   A.   No.

22   Q.   Do you have custody?  Is that still going on?

23   A.   No, that's over.

24   Q.   It's over.  Okay.

25        Do you have any charges pending or anything like that?

1    A.   No.

2    Q.   Okay.  So when Agent Mefford and Agent Tremaine came to

3    see you on June 14th, they didn't offer you anything in

4    exchange for you providing this new testimony?

5    A.   No.

6    Q.   Okay.  It's just specifically what they came to see you

7    for.  And they questioned you specifically about it, and you

8    answered it?

9    A.   Yes.

10   Q.   But nothing is mentioned in this letter you wrote to the

11   governor in July of 2018 about Patrick violating bond

12   conditions or being an addict or anything like that, is there?

13   A.   No.

14   Q.   Okay.  And everything in this letter's true, isn't it?

15   A.   Yes.

16          MR. ROMINES:  That's all I have.  Thank you.

17          THE COURT:  All right.  Any other redirect?

18          MS. REED:  Yes, Your Honor.

19                  FURTHER REDIRECT EXAMINATION

20   BY MS. REED:

21   Q.   So this letter doesn't mention anything about your drug

22   abuse or the defendant's, correct?

23   A.   I wouldn't imagine I would have, no.

24   Q.   And that's because prior to June 2021, you had not

25   mentioned the defendant's drug abuse during home incarceration

1    to anyone, had you?

2    A.   No.

3    Q.   And you talk in here about what a great person you think

4    the defendant is, correct?

5    A.   Yes.

6    Q.   And you still have feelings for him and think that he's a

7    great person, correct?

8    A.   Yes.

9    Q.   Is there any animosity or hard feelings toward him and

10    that's why you provided the statement that you provided?

11    A.   No, ma'am, not at all.  I still think he's an amazing

12    person.

13    Q.   Had you not been asked, would you have voluntarily

14    disclosed that information to anybody?

15    A.   No.

16    Q.   And had you ever previously, in all your conversations

17    with law enforcement, disclosed it to anybody before?

18    A.   No.

19          MS. REED:  Thank you.  I have no additional

20    questions, Your Honor.

21          THE COURT:  Okay.  I'm going to look over my notes to

22    see if I have any.

23    Ms. Turner, you testified about an unplanned drug test

24    that was conducted on the defendant.  I believe it was in the

25    summer of 2014, between June and July of 2014.

1          Is that correct?

2              THE WITNESS:  Yes.

3              THE COURT:  Okay.  Are you aware of any other drug

4      tests that he underwent between 2014 and 2017?

5              THE WITNESS:  No.

6              THE COURT:  Okay.  Were you contacted by any law

7      enforcement, prior to June the 4th, a detention hearing in

8      this case, to be interviewed?

9              THE WITNESS:  No.

10             THE COURT:  All right.  I don't have any other

11     questions.

12         May this witness be excused?

13             MS. REED:  Yes, Your Honor.

14             MR. ROMINES:  Yes, Your Honor.

15             THE COURT:  You're excused.  Thank you.

16         Does the United States have any additional proof on this

17     issue?

18             MS. REED:  No, Your Honor.

19             THE COURT:  Okay.  I have a couple of questions for

20     counsel, first the United States.

21         What drug testing are you aware of that he, defendant,

22     was subject to for the period 2014 through 2017?  I'm aware of

23     a negative test sometime between June and July of 2014.  And

24     then what additional testing?

25             MS. REED:  The other test that Ms. Turner spoke

about, I believe, was around that same time frame.  I only
know of two tests.

THE COURT:  Okay.  So one was in the June to July of
2014 time frame, but I thought that you either asked her
questions about some drug testing in November of that year or
December of that year.

MS. REED:  I don't think I specifically asked her
about those time periods.

I'm aware that there was two.  I don't know if Probation
would have the exact dates.  I can provide copies and attach
it to the records of the exact dates of those tests.  I know
that they were both in that same time frame of very, very
early on in the home incarceration.  And those were provided
by Ms. Steele's office.

I'm not aware of any positive tests, and I do not believe
Probation was aware of any positive tests when we spoke, and I
do not believe that Ms. Steele was aware of any positive tests
when Special Agent Tremaine spoke with her.

THE COURT:  All right.

MS. REED:  So I'm in no way saying there was ever a
positive test.

THE COURT:  Right.  Understood.  I'm just trying to
figure out how many negative tests there were.

MS. REED:  My understanding is there was two.  And it
was a contract company.  So the State, of course, didn't do

1   their own supervision.  There was no officer assigned; that it

2   was contracted out to a company.

3         And during the period of home incarceration -- it wasn't

4   even home incarceration.  The period where the defendant

5   resided with Ms. Turner, there wasn't even an ankle monitor.

6   There was just some third-party contractor who, at some point,

7   there was two tests conducted early on.

8               THE COURT:  All right.  Thank you.

9               MS. REED:  Yes, Your Honor.

10              THE COURT:  Defense counsel, what tests are you aware

11  of?

12              MR. ROMINES:  Judge, we're aware of the testing that

13  was done by the third-party company, and he was also tested in

14  open court.  And I don't have the day of that, Judge.  It's

15  not actually reflected in the file.

16        Sometimes in state court cases, when you show up for a

17  pretrial conference, judges will order a drug test done.  That

18  was done on at least one occasion, according to his defense

19  counsel, and it was a negative test as well.

20        The only thing we know for sure, Judge, is all the tests

21  were negative.  But the case file does not reflect the date of

22  that.  I'm just relying on previous defense counsel.  We were

23  not defense counsel in that underlying case, Judge.  He

24  advised that he was tested at a pretrial conference on one

25  occasion and tested negative.  The date, you know, he wasn't

1    sure of at what point in time in the course of the litigation

2    that occurred.

3           THE COURT:  Okay.  I'm going to ask both counsel, in

4    your post-hearing submissions, to also provide the Court with

5    any information that you have about the negative drug testing,

6    who it was performed by and when.

7           MR. ROMINES:  Yes, Your Honor.

8           THE COURT:  So whatever you can each figure out on

9    those issues, please provide that along with the submission to

10    the Court that's due by this Thursday at 5:00.

11       I reached out to the U.S. Probation Office in advance of

12    this hearing, and I want to put, for the parties, on the

13    record that the information received by the U.S. Probation

14    Office was that there was no testing that was done at all.

15    Apparently there was some testing from a third-party

16    contractor, at least early on.

17       But the information that I received through a probation

18    officer was that Stephanie Haney with the Knox County Pretrial

19    Services had followed up after our U.S. Probation Office

20    reached out.  Ms. Haney stated that Mr. Baker was not ordered

21    to be drug tested; and, therefore, no drug tests were

22    performed during his release from 2014 to 2017.  Obviously,

23    that was -- the information that Ms. Haney provided was

24    inaccurate.

25       Ms. Haney advised that Emcon Home Incarceration -- or she

1    referred our probation officer to Emcon Home Incarceration to

2    see if there were tests that were conducted by them.  She

3    received a call back, and an individual confirmed that the

4    defendant was not drug tested during this period.  So again,

5    that was an error because there was at least some form of drug

6    testing done.  Perhaps it was limited to the early days.

7         But whatever the parties -- whatever information you can

8    provide the Court related to what drug testing was done and

9    when during the period 2014 through 2017, please provide that

10   to the Court.

11        Mr. Baker was arrested in this case on May the 27th; is

12   that correct?

13             MR. ROMINES:  Yes, Your Honor.

14             THE COURT:  Okay.  Finally -- well, let me ask, does

15   the defense have any additional evidence in response to the

16   evidence presented by the United States?

17             MR. ROMINES:  No, Your Honor.

18             THE COURT:  One particular issue I'd like to follow

19   up on with defense counsel.  In the detention hearing, defense

20   counsel offered up the possibility of a property or cash bond

21   to be posted.  Let me hear your position on that issue.  And

22   then, of course, I'm happy to hear any response by the United

23   States.

24             MR. ROMINES:  Yes, Your Honor.  There are two pieces

25   of real estate that total approximately $400,000.  They're

1     owned by Mr. Baker's father, John Baker.  One is in Laurel

2     County.  The other's in Knox County, correct?  They are now

3     paid off, Your Honor.

4         And, Your Honor, his fiancee, Natasha Collins, is also

5     prepared to post her house.  It has less equity in it.  It was

6     recently purchased.  But she was also prepared to post that.

7     And that would be where he would be residing on home

8     detention, Your Honor.

9              THE COURT:  All right.  Anything from the United

10    States on that issue?

11             MS. REED:  No, Your Honor.

12             THE COURT:  Okay.  So anything else that we need to

13    address as part of this hearing?  First from defense counsel.

14             MR. ROMINES:  Regarding bond, Your Honor -- there is

15    one other matter I would like to address to the Court, but

16    nothing further regarding bond, Judge, or the detention

17    hearing.

18             THE COURT:  Okay.  Just remind me if I forget.

19        So what the Court is requiring is post-hearing briefing

20    by the end of the day this Thursday on the narrow issue of the

21    standard for reopening this detention hearing, along with any

22    arguments specifically addressing the new evidence that was

23    heard.

24        I do not need to hear your arguments that have already

25    been made as part of the -- in fact, do not make your same

arguments that were made as part of the original detention

hearing.  I only want to hear additional argument related to

the threshold issue for reopening the hearing and what bearing

this new evidence has on the detention analysis.

Third, I want submissions from each of you -- they can be

exhibits to that or however you want to address it -- related

to any drug testing during the period of pretrial release 2014

through 2017.

Any questions about that, Mr. Romines?

MR. ROMINES:  No, Your Honor.

THE COURT:  Ms. Reed?

MS. REED:  No, Your Honor.

THE COURT:  Okay.  Anything else related to this

hearing, Ms. Reed, that we need to address?

MS. REED:  No, Your Honor.

THE COURT:  All right.  Mr. Romines.

MR. ROMINES:  Judge, there is one matter, and

hopefully it can be short.

On June 9th, Magistrate Judge Hanly Ingram issued an

order regarding, because it is a possible capital case, issued

an order that defense counsel, pursuant to 18 USC 3005,

provide curriculum vitae, account of training regarding

complex criminal litigation, a description of the knowledge

and understanding of procedural and substantive law, extent

that the attorney has participated in investigation and

1    mitigation of capital cases.  It's a laundry list of things,

2    Your Honor.

3         I advised him at the initial appearance that I had been

4    appointed as learned counsel by Your Honor on the

5    recommendation of Scott Wendelsdorf and had been appointed as

6    learned counsel by Judge Grady Jennings, as well as the late

7    Judge John Heyburn.  I actually have the order of Your Honor

8    appointing me as learned counsel in a capital case in the

9    Western District.

10        I was just hoping that we can alleviate the need for

11   filing all of that information because the Court has

12   previously found me to be qualified as learned counsel and

13   appointed me in connection to cases before you.

14             THE COURT:  If you're asking me to review that order,

15   I am going to decline to do so.  I think it's a very good idea

16   for purposes of the record in this case and will cause very

17   little effort on defense counsel's part to provide your

18   curriculum vitae and a list of cases where you have served as

19   learned counsel.  So I'm going to ask you that you follow

20   through or require that you follow through --

21             MR. ROMINES:  That's fine, Your Honor.

22             THE COURT:  -- with Judge Ingram 's order in that

23   regard.

24             MR. ROMINES:  Thank you, Judge.

25             THE COURT:  Anything else from defense counsel?

1          MR. ROMINES:  No, Your Honor.

2          THE COURT:  Anything else on behalf of the United

3    States?

4          MS. REED:  No, Your Honor.

5          THE COURT:  All right.  I will look forward to

6    receiving your submissions this Thursday.  The Court will then

7    take it under advisement, and I will get out an order

8    promptly.

9        We'll be in recess until my next hearing.  Thank you.

10       (Proceedings concluded at 10:12 a.m.)

11                          -  -  -

12                    C E R T I F I C A T E

13          I, JOAN LAMPKE AVERDICK, RDR, CRR, certify that the
     foregoing is a correct transcript from the record of
14   proceedings in the above-entitled case.

15   _\s\ Joan Lampke Averdick_____      _ June 23, 2021_____
     JOAN LAMPKE AVERDICK, RDR, CRR      Date of Certification
16   Official Court Reporter

17

18

19

20

21

22

23

24

25

```
 1                            INDEX

 2    GOVERNMENT WITNESSES

 3    MARK MEFFORD
           Direct examination........................... Page  7
 4         Cross-examination............................ Page 15

 5    DAWN TURNER
           Direct examination........................... Page 30
 6         Cross-examination............................ Page 34
           Redirect examination......................... Page 39
 7         Recross-examination.......................... Page 41
           Further redirect examination................. Page 44
 8

 9                           EXHIBITS

10    GOVERNMENT EXHIBITS

11    Exhibit Nos. 1-3, Interviews of Dawn Turner
12         Identified................................... Page 26
           Admitted..................................... Page 26
13

14    DEFENSE EXHIBITS

15    Exhibit No. 1, Letter by Dawn Turner to governor
16         Identified................................... Page 42

17                           - - -

18

19

20

21

22

23

24

25
```