UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6:21-cr-32-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| PATRICK BAKER, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This matter is before the Court on the United States' objections, [R. 21, R. 22], to the Magistrate Judge's Findings and Statement of Reasons for Release as to Patrick Baker ("Findings and Statement of Reasons"), [R. 20]. The Court stayed the entry of the pending release order, [R. 24], and the parties subsequently briefed both procedural matters and the merits of release, [R. 27; R. 28]. The Court conducted an additional evidentiary hearing on June 22, 2021 based on new evidence bearing on the detention analysis, [R. 29; R. 30]. The parties have submitted post-hearing briefs, [R. 33; R. 34; R. 41]. The matter is fully briefed and ripe for review. For the reasons that follow, the Court will exercise its discretion to consider the new evidence presented at the June 22, 2021 hearing and, upon a de novo review of the Magistrate Judge's Findings and Statement of Reasons pursuant to 18 U.S.C. § 3145, the Court will order that Defendant Patrick Baker remain in custody pending trial.

## I. BACKGROUND

A grand jury returned an indictment in this case on May 27, 2021. [R. 1] That indictment charges Defendant Patrick Baker with the May 9, 2014 murder of Donald Mills in violation of 18 U.S.C. § 924(j)(1), which applies when a defendant causes the death of another person through

the use of a firearm and during the course of a violation of § 924(c). *See* 18 U.S.C. § 924(j)(1). Section 924(c), in turn, applies when the defendant possesses, brandishes, or discharges a firearm in the furtherance of a crime of violence or a drug trafficking crime. *See id.* § 924(c). In this case, the indictment cites a drug trafficking crime, namely, a conspiracy to distribute oxycodone. [R. 1]

On June 1, 2021, Defendant was arraigned, at which time the United States moved for detention. [R. 12] Defendant was interviewed by United States Probation Officer ("USPO") Brittney Crisp the following day. On the morning of June 4, 2021, a Pretrial Services Report ("PSR") and its Addendum were submitted to the Court. Magistrate Judge Hanly A. Ingram then conducted a detention hearing later that day. [R. 15] After the detention hearing, the parties submitted briefs on their respective positions. [R. 16; R. 17]. The Magistrate Judge thereafter issued his Findings and Statement of Reasons. [R. 20] The Magistrate Judge found that a rebuttable presumption in favor of detention arose under 18 U.S.C § 3142(e)(3), but that the defendant had fully rebutted that presumption. *Id.* at 7. In reaching this conclusion, the Magistrate Judge relied primarily on the evidence that Defendant had complied with all conditions of his pre-trial release for three years (from 2014–2017) in a related state court case in which Defendant was also charged with the murder of Donald Mills. The Magistrate Judge then considered the evidence presented by the United States and the factors set forth under § 3142(g) and found that a series of strict conditions could sufficiently mitigate any risk of flight and danger posed by Defendant's release. *Id.* at 7–15. The Magistrate Judge did not enter an order of release at that time, however, and instead scheduled a status conference for June 9, 2021 to confirm that any firearms in Defendant's residence had been removed and that any controlled substances in the home had been reasonably secured from Defendant. *Id.* at 15; [R. 23]

On June 9, 2021, prior to the status conference, the United States filed its objections to the Magistrate Judge's Findings and Statement of Reasons, [R. 21; R. 22]. The United States specifically sought review of the Magistrate Judge's proposed order of release pursuant to 18 U.S.C. § 3145(a)(1) and requested a stay of the Magistrate Judge's order until this Court completed its review. [R. 21; R. 22] The Court stayed the entry of the order of release, ordered the United States to submit written argument on its objections, and ordered the defense to respond to the objections. [R. 24]

In its brief to this Court, the United States asked that "the Court re-open the evidentiary hearing pursuant to 18 U.S.C. § 3142(f)(2), on the basis of newly discovered evidence obtained on June 14, 2021 previously unknown to the government." [R. 27, p. 1] In support of this request, the United States pointed to an interview conducted on June 14, 2021, in which Defendant's ex-girlfriend, Dawn Turner, revealed to law enforcement that Defendant had regularly abused oxycodone during his pre-trial release in his related state matter. *Id.* Defendant objected to reopening the hearing. [R. 28, pp. 7–8]

The Court then conducted a hearing on June 22, 2021 for the limited purpose of determining whether the United States had satisfied the standard for reopening a detention hearing under § 3142(f) and if so, whether the United States' new evidence warranted detention. [R. 29; R. 30] At the hearing, the Court ordered the parties to submit post-hearing briefs addressing those same issues—specifically, what standard applies to a request to reopen under § 3142(f) and whether the United States satisfied that burden, and what bearing the new evidence should have on the Court's detention analysis. [R. 30].

Defendant filed a brief addressing these issues, [R. 33]. The United States also submitted a post-hearing brief, [R. 34], but argued that § 3142(f) applies only when the same judicial

officer who conducted the initial hearing considers a request to reopen that hearing. The United States argued that § 3145 applied instead, and this Court should exercise its discretion under that statute to consider the new evidence when conducting a de novo review of the Magistrate Judge's order. [R. 34, pp. 2–5] The Court ordered Defendant to respond to this argument, [R. 35].

In his response, Defendant agrees that the Magistrate Judge's Findings and Statement of Reasons is properly before the Court for de novo review pursuant to § 3145(a). [R. 41, p. 3]. He argues, however, that the Court should refrain from considering the new evidence presented on June 22, 2021 because "[t]he United States should not be allowed multiple bites of the apple to see if they can eventually obtain the result they seek." *Id.* Defendant further argues that, even if the Court considers the new evidence, Defendant should be released because the conditions suggested by the Magistrate Judge (including drug testing, house arrest, and no-cause searches) mitigate against the risk of danger. *Id.* at 4.

The Court has thoroughly reviewed the record in this matter, including reviewing the PSR and its Addendum, listening to the audio recording of the June 4, 2021 detention hearing, and reviewing the parties' written arguments filed after that hearing, [R. 16; R. 17; R. 21; R. 22], and their written arguments filed in relation to the June 22, 2021 hearing, [R. 27; R. 28; R. 33; R. 34; R. 41]. Based on its review of the record, the arguments of the parties, and the applicable law, the Court will exercise its discretion under § 3145(a)(1) to consider the new evidence presented by the United States at the June 22, 2021 hearing. Further, for the reasons stated herein, the Court finds that no combination of conditions will reasonably assure the safety of others and the community. The Court will therefore order that Defendant remain in custody pending trial.

## II.    ANALYSIS

**A.  Reopening a Detention Hearing Under 18 U.S.C. § 3142(f) Versus Reviewing A Release Order Under 18 U.S.C. § 3145(a)(1)**

Under 18 U.S.C. § 3142(f), a detention hearing

> may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

Thus, the statute presents a two-prong analysis. First, the party seeking to reopen the hearing must demonstrate that "information exists that was not known to the movant at the time of the [initial detention] hearing." *Id.* Then, the movant must establish that that information is material to the defendant's release conditions regarding flight or dangerousness. As the Court explained in a previous order, some courts interpret this strictly and require the moving party to demonstrate good cause as to why the new evidence was unavailable for the initial detention hearing, while others have taken a more relaxed approach. [R. 29] At the June 22, 2021 hearing, the Court further explained that the Sixth Circuit had previously applied the stricter approach. *See United States v. Sandles*, 9 F.App'x 377, 379 (6th Cir. 2001); *United States v. Ramadan*, No. 20-1450, 2020 WL 5758015, *1 (6th Cir. Sept. 22, 2020); *United States v. Bothra*, No. 19-1953, 2019 WL 8883664 (6th Cir. Nov. 5, 2019).

Under 18 U.S.C. § 3145(a)(1), if a magistrate judge orders a defendant released, the United States "may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release." At that point, the district court can undertake a de novo review of the magistrate judge's decision. *See, e.g.*, *United States v. Crane*, No. 5:15-005-DCR, 2015 WL 4424957, *2 (E.D. Ky. July 17, 2015). Under those circumstances, the district court may, at its discretion, conduct an additional evidentiary hearing.

*See United States v. Cidraz-Santiago*, 18 F.Supp.3d 124, 126 (D.P.R. 2014) ("A district Court may take additional evidence or conduct a new hearing when appropriate." (citations omitted)); *United States v. Dominguez*, 783 F.2d 702, 708 n.8 (7th Cir. 1986) (remanding to District Court for further review and "leav[ing] to the district judge's sound discretion the question of whether, and if so how, additional evidence should be taken on remand"); *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985) (finding no error in District Court's decision to order pretrial detention despite Magistrate Judge's decision to release the defendant, after consideration of the record and additional evidence); *United States v. Walters*, 89 F.Supp.2d 1217, 1220 (D. Kan. 2000) ("The district court may conduct evidentiary hearings if 'necessary or desirable,' and the hearings are not limited to situations where new evidence is being offered. These matters are left to the district court's sound discretion." (citations omitted)); *United States v. Martinez*, No. 1:12-cr-210, 2012 WL 4815018, *1 (W.D. Mich. Oct. 10, 2012) ("The Court may receive additional evidence or rely on the record of the earlier hearing." (citations omitted)).

Courts that have considered these two provisions have concluded that § 3142(f) applies to requests to reopen hearings before the same judicial officer who conducted the initial hearing. *See, e.g.*, *United States v. Cisneros*, 328 F.3d 610, 614 (10th Cir. 2003). In other words, if a magistrate judge conducts the initial detention hearing, any motions to reopen that hearing under § 3142(f) should be directed at that same magistrate judge. *Id.* Section 3145, on the other hand, governs a district court's review of a magistrate judge's release or detention order.

Accordingly, the Court finds that two options were available to the United States for purposes of presenting new information relevant to Defendant's detention. *See United States v. Patterson*, No. 13-137, 2013 WL 5375438, *3 (E.D. La. Sept. 24, 2013). Under § 3142(f), the United States could request that the evidentiary hearing be reopened, such that the Magistrate

Judge could consider the new evidence and, if necessary, revise his earlier findings. Or, under § 3145(a)(1), the United States could have sought de novo review of the Magistrate Judge's decision, at which point it could have asked the Court to exercise its discretion and conduct a second evidentiary hearing.

The United States first pursued de novo review under § 3145(a)(1). It then incorrectly cited § 3142(f) when asking this Court to reopen the hearing, causing some procedural confusion. However, regardless of the government's citation to conflicting statutes, the Court agrees that it has the discretion under § 3145(a)(1) to hear additional evidence as part of its de novo review under that statute.[1] That issue has been fully briefed. Having considered the record in this case and the arguments of counsel, the Court will exercise its discretion to consider the additional evidence presented at the June 22, 2021 hearing (the testimony of Dawn Turner) and will conduct a de novo review of the Magistrate Judge's Findings and Statement of Reasons, [R. 20], pursuant to § 3145.

### B. De Novo Review of the Magistrate Judge's Findings and Statement of Reasons for Release as to Patrick Baker, [R. 20]

#### 1. Statutory Framework

Pursuant to the Bail Reform Act, 18 U.S.C. § 3141, *et seq*., a defendant may be detained pending trial only when a judicial officer "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). "The default position of the law, therefore, is

---

[1] The Court acknowledges Defendant's concern that the United States is taking "multiple bites of the apple," [R. 41, p. 3], and the United States likely failed to satisfy the standard required for reopening a detention hearing under § 3142(f). Regardless, this Court, as the Court of original jurisdiction, has discretion to conduct an evidentiary hearing on de novo review of the Magistrate Judge's Findings and Statement of Reasons. The Court finds that the evidence presented at the June 22, 2021 hearing is material to the detention analysis, and it will therefore exercise its discretion to consider this new, material evidence.

that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). However, this default is modified for certain defendants considered "particularly dangerous" under 18 U.S.C. § 3142(e)(3). *Id.* Under that provision, if probable cause exists to believe that a defendant committed one of the crimes listed in 18 U.S.C. § 3142(e)(3), a rebuttable presumption arises "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." A grand jury indictment alone will satisfy the probable cause requirement. *Id.* at 945; *see also United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985).

Section 3142(e)(3) imposes a "burden of production" on the defendant. *Stone*, 608 F.3d at 945. That burden is not heavy, and the defendant satisfies it when he "com[es] forward with evidence that he does not pose a danger to the community or a risk of flight." *Id.* at 945 (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)) (internal quotation marks omitted). Even when a defendant satisfies this burden, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Id.* (quoting *Mercedes*, 254 F.3d at 436) (internal quotation marks omitted). In other words, the presumption becomes "an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Dominguez*, 783 F.2d at 707 (citations omitted).

As the Sixth Circuit has explained, § 3142(e)(3)'s presumption "imposes only a 'burden of production' on the defendant, and the government retains the 'burden of persuasion.'" *Stone*, 608 F. 3d at 945 (citations omitted). Specifically, the United States must persuade the Court by clear and convincing evidence that no conditions of release can ensure the safety of the community, or it must persuade the Court by a preponderance of the evidence that no conditions

can ensure the defendant's appearance in future proceedings. 18 U.S.C. § 3142(e)–(f). Flight and danger are separate concepts, and facts relevant to flight risk may not necessarily reduce the risk of danger. *See, e.g.*, *United States v. Mercedes*, 254 F.3d 433, 436–37 (2d Cir. 2001) ("We have expressly held in several cases that a bail package that might 'reasonably assure the appearance of [the defendant] at trial, will not reasonably assure the safety of the community.'" (citation omitted)); *United States v. Holland*, No. IP 06-172-CR-01 T/F, 2006 WL 3755926, at *4 (S.D. Ind. Dec. 19, 2006) ("The presence of community ties and related ties have been found to have no correlation with the issue of safety of the community." (citations omitted)). In the present case, the government argues only that no condition or series of conditions can reasonably ensure the safety of others and the community. *See* [R. 17, pp. 1, 12; R. 27, pp. 1, 15; R. 34, p. 5].

In his Findings and Statement of Reasons, the Magistrate Judge addressed the rebuttable presumption of detention that arises in this case under 18 U.S.C. § 3142(e)(3) and determined that it applied in this case. The Court agrees. The rebuttable presumption is triggered when there exists probable cause to believe that a person committed an offense under § 924(c). *See* 18 U.S.C. § 3142(e)(3). Here, Defendant is charged with violating 18 U.S.C. § 924(j)(1), which also requires the United States to prove an offense under § 924(c). *See United States v. Moonda*, No. 4:06-MJ-6049, 2006 WL 2225822, *7 (N.D. Ohio Aug. 2, 2006). Accordingly, the indictment in this case, [R. 1], triggers the rebuttable presumption in favor of detention.

Next, the Court considers whether Defendant rebutted that presumption by providing "evidence that he does not pose a danger to the community or a risk of flight." *Stone*, 608 F.3d at 945 (quoting *Mercedes*, 254 F.3d at 436) (internal quotation marks omitted). The Court also considers whether the United States satisfied its burden of persuasion.

## 2. Evidence Presented at the June 4, 2021 Detention Hearing

The evidence presented at the June 4, 2021 detention hearing was extensive and detailed, and the Court will not fully recite that evidence here. The following is a brief summary of the evidence presented. At the June 4, 2021 hearing, the defense called two witnesses. First, USPO Brittney Crisp testified regarding the contents of the PSR and Addendum. The PSR, the contents of which were verified by Defendant's brother, indicates that Defendant has resided in Kentucky for most of his life, with the exception of one year spent in Florida. He currently resides in Frankfort, Kentucky, with his girlfriend, Natasha Collins, and has lived there for approximately one year. Defendant has daily contact with his parents and regular contact with a brother, all of whom live in southern Kentucky. He does not have a passport and reports traveling outside the United States only once, in 2008 to snow ski in Canada. He is currently unemployed and is a stay-at-home-father for his infant daughter. The PSR indicates that he essentially has no assets or liabilities. He is in good physical health, though he recently made one visit to a mental health professional in Frankfort due to "things he had been through in his life and preparing to be a father." He was prescribed an unidentified medication (later identified by his girlfriend as Zoloft), but discontinued its use after one dose. He acknowledges yearly use of alcohol and rare use of cannabinoids. He admits suffering an addiction to prescription opiates, beginning at age thirty, but he reported to USPO Crisp that he stopped using opiates seven years ago. He further reported using an unidentified drug one time that he believes was methamphetamine. His criminal history includes many minor traffic matters. The PSR recommends detention.

The PSR and its Addendum also provide additional details about the underlying charge in this case. In 2014, Baker was charged with murder in Knox Circuit Court. In December 2017, a jury found him guilty of reckless homicide, first-degree robbery, impersonating a peace officer,

and tampering with physical evidence. As a result, he was sentenced to nineteen years of imprisonment. His conviction and sentence were affirmed by the Kentucky Court of Appeals, which described the evidence against Defendant as "overwhelming," and the Supreme Court of Kentucky denied discretionary review. *Baker v. Commonwealth*, 2018 WL 6721295, *3 (Ky. App. Dec. 21, 2018), review denied, No. 2019-SC-59-D (Ky. Oct. 24, 2019). Prepared at the Court's request, the Addendum provides the following detail concerning this case:

> Pertaining to Count 1, the defendant was originally charged with Murder, which was amended to the guilty, lesser charge.[2]
>
> The defendant was arrested on May 9, 2014, in Knox District Court Case Number 14-F-00193 and charged with Count 1, Murder. The defendant was released on a $400,000.00 cash and property bond posted by [his parents] John and Jacqueline Baker and the defendant was placed on home incarceration. No violations of bond were noted in the court record. An indictment was returned by the grand jury on July 25, 2014 and a $500,000.00 cash bond was set in this case. On November 12, 2014, the $500,000.00 cash bond was posted, and the defendant was released on bond. No violations of bond were noted in the court record.
>
> Per the court record, on December 6, 2019, an executive order was entered providing Baker with a pardon for charges associated with this conviction.

The defense's second witness at the June 4, 2021 hearing was Defendant's current girlfriend, Natasha Collins. Ms. Collins is employed with the Kentucky natural resources cabinet as an environmental compliance officer. Her romantic relationship with Defendant Baker began while they were both students at Eastern Kentucky University. They eventually traveled together to Florida, where they lived for less than a year while Defendant pursued his ambitions to become a professional golfer. The pair ultimately grew apart, and each returned to Kentucky. The two remained friends, and eventually rekindled their romantic relationship many years later. They now live together in Frankfort, Kentucky, with their infant daughter. Ms. Collins also has a

---

[2] To be clear, the murder charge was not amended; rather, the jury found Defendant not guilty of murder but guilty of reckless homicide.

child from a prior marriage who stays with her half the time. Ms. Collins purchased their home in June 2020, and they are renovating it. Defendant does not work outside the home, but cares for the children and helps Collins's parents as well.

Ms. Collins and Defendant were not together at the time of the state case. The father of Ms. Collins's older child was concerned when Ms. Collins and Defendant began dating again, given the circumstances of that case. Ms. Collins testified, however, that the father has since said the daughter could not have a better stepfather than Defendant. Ms. Collins generally described Defendant as likable, mentally stable, physically healthy, and churchgoing. She testified that she has never seen Defendant use or abuse drugs since they began dating again, and he only occasionally uses alcohol. She acknowledged she has a firearm in the home but agreed it could be removed.

The defense offered Ms. Collins as a potential third-party custodian, and the Magistrate Judge questioned her on this issue. The Magistrate Judge reviewed all typical requirements of such an obligation, as well as the penalties for a violation. Ms. Collins swore that she could report a violation or absence from her custody. She acknowledged having an alcohol intoxication conviction, a disorderly conduct conviction, and a fourth-degree assault charge filed against her but ultimately dismissed. The charges apparently stemmed from a divorce with some violent components. The Magistrate Judge also asked Ms. Collins about her current prescribed medications. She listed two prescriptions for controlled substances, though she only believed that one of the medications was a controlled substance while the she did not know if the other medication (Lorazepam) was a controlled substance. Ms. Collins also clarified that she currently works remotely from her home, with few regular activities that take her outside the home.

After the defense presented these witnesses, the Magistrate Judge found that the presumption in favor of detention had been fully rebutted for the reasons stated on the record. In so ruling, the Magistrate Judge relied primarily on the evidence of more than three years on strict release conditions with no reported violation.

After the Magistrate Judge found that the presumption had been rebutted, the government called ATF Special Agent Todd Tremaine as a witness. Special Agent Tremaine described a joint federal and state investigation into the May 9, 2014 shooting death of Donald Mills. His testimony was lengthy and detailed. The Court has reviewed his testimony in its entirety. The Court has also reviewed the Magistrate Judge's summary of key points from Special Agent Tremaine's testimony, and finds that summary to be relevant, thorough, and worthy of repeating here:

- Evidence from the scene of the shooting, including photographs presented by the government, depict forced entry into Mills's residence, shell casings and blood found inside and outside the residence, a pair of plastic handcuffs, and a camouflage ghillie suit found a half mile down the road. Shell casings just outside the home were identified as 40-caliber. Five casings in the master bedroom were 9-millimeter.

- Mills's wife, Charlene, was interviewed close in time and later provided sworn testimony. She reported that at 5:01 on May 9, the residence door was kicked in and two males entered and demanded a show of hands. The men identified themselves as DEA or Operation Unite. One of them took her and three children into one side of the residence. The second man, the skinnier man, was with Donald elsewhere. Charlene demanded to see their warrant. She then heard the skinnier man ask repeatedly where the money and dope were. A commotion and gunshots followed. She called her mother-in-law Phyllis and put the phone down. The two men left in a maroon Ford F150 pickup. Charlene fired several rounds of a 40-caliber firearm at the truck as it left. She recalled seeing Elijah Messer in the same vehicle two days prior. She described her husband as a known large-scale oxycodone dealer.

- Phyllis was interviewed as well. She reported that, after she received the call from Charlene, she went to the residence and saw two males leaving. One was heavier set and the skinnier one claimed be a U.S. Marshal. She said the skinnier one had brown eyes, but Tremaine confirmed Baker's eyes are blue. Inside the residence she found her son was shot and he said he could not breathe.

- Mills died and the cause was determined to be . . . chest gunshot wounds.

- The investigation found that two pairs of toy handcuffs were sold at the Dollar General store in London on May 8. The receipt and surveillance photos concerning that purchase were obtained. Special Agent Tremaine identified Baker and Christopher Wagner in the photos.

- Elijah Messer and Adam Messer were located and interviewed. They initially denied knowledge of the incident, but were re-interviewed. Adam Messer stated he knew Donald Mills to be an oxycodone supplier and, on the night of May 8, two people he had never seen before showed up. Adam Messer said he later came to know these men as Patrick Baker and Christopher Wagner. Baker showed Adam Messer a Google Earth picture of a residence on an iPad. Baker also had pictures on his cell phone of Baker and Elijah Messer. According to Adam Messer, there was talk of going to rob somebody.

- Elijah Messer was interviewed, including as recently as April 30 of this year. Elijah Messer said that on May 7 Stephanie Smith (now deceased) and Baker arrived at his residence in a maroon Ford F150 looking for 50-60 pills. Elijah told them that Donald Mills up the road was an oxy seller. The three of them went together to Mills's residence in Baker's vehicle. Mills told Elijah Messer he only had 50 pills but would have more later. Elijah purchased 50, and, at the vehicle, Mills said they should come back because he would have more the next day. Smith suggested they immediately rob Mills, but Elijah said no to that demand. Tremaine identified Mills and Elijah from a picture taken from inside a vehicle by an apple iPhone 5S. Location data later put the phone on Donald Mills's property. The 50 pills were partially divided up, including some provided to Elijah for arranging the deal. The three left Mills's residence and later dropped Elijah Messer off. Elijah stated that at approximately 2:00 a.m. on May 9, at Adam's residence, Baker and Wagner arrived and said they were looking for pills. Elijah said Baker looked "dope sick" and provided some meth to Baker, who split it with Wagner. Baker wanted to discuss a robbery. He showed Elijah a Google Earth image (later recovered from Baker's iPad), and wanted to know from Elijah how to conduct the robbery. The plan was to pose as police officers with fake handcuffs. Elijah saw Baker and Wagner put camouflage [in] the truck, which Tremaine described as matching the ghillie suit later found. Elijah said that, at Baker's request, Elijah planned to meet them after the robbery at the end of the holler and exchange some of the pills to Baker in exchange for more meth. Elijah waited there and saw Baker drive by very fast. They met at another location. Baker told Elijah that Mills pulled a gun and Baker had to shoot him and they did not get anything from the robbery.

- Christopher Wagner was interviewed and said he knew Baker for 15-20 years and they used pills daily leading up to the events of May 9. He said Baker also sometimes distributed user quantities to friends. On May 8, Wagner got off work early and his boss dropped him off at Baker's residence. Baker then told him about an easy robbery of a man he had just met that might have $100-200,000 and up to 1,500 pills and that they could pretend to be cops. They purchased handcuffs at the Dollar General in London, and they went to Knox County to a residence unknown to him. Prior to that they got firearms and masks from Baker's residence. Prior to agreeing to the robbery, Wagner told Baker he did not have a

firearm, and Baker responded that Wagner could use Baker's wife's gun. Wagner said Baker also had another firearm that was brown in color. After getting and using meth, they prepped the robbery and agreed Wagner would get one-quarter of the proceeds. They proceeded to Mills's residence, Baker kicked in the door and went left and Wagner went right. Tremaine said Wagner's account was almost identical to Charlene's description. When they fled the residence in the truck, Baker told Wagner they only obtained a few pills. They later divided and used the pills. After fleeing the robbery, they were looking for a way out of Knox County and went to a wilderness trail in Bell County known as the "Bridge to Nowhere." They burned clothes, disassembled the firearm Baker had used, and buried portions of it. They threw the handcuffs and vests over a steep ridgeline. Wagner returned the firearm he had used to Baker to return to Baker's wife.

- Wagner later took law enforcement to the spot where the firearm was buried. A photo introduced by the government depicted components of a firearm, including one with a serial number of SN 482. The items were found "precisely" where Wagner said they would be located. The barrel was never recovered.

- Law enforcement's analysis of Baker's cell phone location data confirmed he was in the area of the purchase of the handcuffs at the Dollar General at the time of the purchase, at various locations in Knox County, and then later in Bell County after 7:00 a.m. approximately three miles from the entrance to the Bridge to Nowhere location.

- Warrant-backed searches at Baker's residence and garage resulted in finding a maroon Ford F150 and a firearm case/box with serial number SN 482. Later investigation revealed the original purchaser of the firearm was Edward Huckleby, who was Baker's former father-in-law. Forensic analysis of the shell casings in Mills's bedroom where he was shot were linked to the firearm's slide assembly that was recovered, but no barrel comparison could be made. An iPad found at Baker's residence contained a Google Earth image of Mills's residence.

- Baker's ex-wife confirmed the return of her firearm that Wagner described to law enforcement. She told law enforcement she discovered that her firearm, normally kept by the bed, was out. She called Baker to ask why it was out. He acknowledge[d] he had taken it and said he put a scope on it. In sworn testimony provided after their divorce, she stated Baker confessed to the plot to rob Mills with Wagner and described the events in detail in a way that matched Charlene and Wagner's description. She said Baker told her he had to shoot Mills out of self-defense. Baker's girlfriend at the time of the May 9 events said that, immediately following the events, Baker told her he wanted to go on vacation to Charleston, S.C.

Defense counsel's cross-examination of Special Agent Tremaine was extensive. Among other things, Special Agent Tremaine acknowledged that the state court jury had returned a "not guilty" verdict on the murder charge; Phyllis could not identify the two men at the residence

because they both wore masks; a child at the scene said someone had a tattoo but Special Agent Tremaine does not believe that Defendant has a tattoo; Defendant was "excluded" from DNA found on the handcuffs; Elijah initially lied to law enforcement; no DNA or fingerprint evidence places Defendant in Mills's residence; Wagner pleaded guilty; aside from two interviews he has conducted after the state court conviction, there is no new evidence relating to the murder; Defendant's ex-wife did not make any statements in 2014 but later described an alleged confession by Defendant in 2017; and the victim's mother stated that the skinnier of the two men had brown eyes, while Defendant has blue eyes. The defense did not offer its own proof to otherwise contradict Tremaine's testimony.

Donald Mills's sister, Melinda Mills, spoke on behalf of the Mills family. Her statement was unsworn; she was not a witness but instead spoke pursuant to the Crime Victims Rights Act. Ms. Mills was understandably emotional and requested that Defendant "be kept locked up." She stated, "We fear for our safety," and explained that the Mills family was afraid of what else Defendant might be capable of doing if he was willing to impersonate a federal officer during an armed home invasion. She also addressed some comments directly to Defendant.

### 3. New Evidence Presented at the June 22, 2021 Hearing

At the June 22, 2021 hearing before this Court, the United States presented additional evidence. Specifically, the United States presented testimony from Dawn Turner, Defendant's ex-girlfriend whom he lived with while on pretrial release in 2014–2017. Ms. Turner testified that she first met Defendant while in college in 1999. They dated most recently from November 2013 through July 2019. She explained that, shortly after being released on pretrial home incarceration in 2014, Defendant resided with her, and remained with her until his trial in 2017. When asked by the United States whether the two had engaged in any drug use during that

period, Ms. Turner responded in the affirmative. She could not remember exactly how it first came about, but she testified that in late November or early December 2014, she and Defendant were getting ready to do some Christmas shopping. He presented her with two blue pills, oxycodone. She took one-half of a pill, and he took the remaining pills. Ms. Turner testified that this was not the only time that the two took oxycodone while Defendant was on pretrial release. She explained that their drug use gradually increased into a full-blown addiction, and they were using oxycodone "daily, for the most part." During this time of daily drug use, Ms. Turner was employed with the Department of Community Based Services, and she helped finance their drug use, though Defendant would occasionally receive money from his parents or from doing odd jobs at a family business. When they did not have money for oxycodone, Ms. Turner and Defendant would "fall back on suboxone" to hold them over. She stated that she was still addicted at the time that Defendant was convicted and incarcerated. However, she attended rehab in the fall of 2019 and testified that she was currently sober.

Much of Ms. Turner's cross-examination focused on whether the government met its burden to reopen the evidentiary hearing under § 3142(f), including Ms. Turner's availability to testify at the initial detention hearing and her willingness to relay the same information about Defendant's drug use during earlier interviews, though she had never been asked by the United States or investigators about it. Defense counsel also presented a letter that Ms. Turner wrote to Kentucky Governor Matt Bevin in July 2018 supporting Defendant's application for a pardon (which he later received). She acknowledged that she was addicted to oxycodone and was still dating Defendant at the time of that letter, though she stated that she still believed all the nice things she said about Defendant in the letter. She also explained that she quit her job after

Defendant was convicted in state court, and she then temporarily lost custody of one of her children due to reports of her drug use.

At the June 22, 2021 hearing, the Court also questioned the parties about Defendant's drug testing while on pretrial release in state court. The parties were aware of only two drug tests, and the United States later provided copies of those results. The drug tests took place in June and July 2014, and both returned negative results. [R. 34-1]

### 4. 18 U.S.C. § 3142(g) Factors

The Court finds that the Defendant initially came forward with credible evidence that he does not pose a risk of danger or flight. He provided evidence that he had complied with the terms of his pretrial release in state court and that he had a stable home life and long-standing family ties to Kentucky. Further, the record, prior to June 22, 2021, lacked any evidence of misbehavior since 2014. He therefore presented some credible evidence sufficient to rebut the presumption if favor of detention. However, even when rebutted, the presumption does not disappear; rather, it becomes "an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)." *Dominguez*, 783 F.2d at 707. The presumption retains evidentiary weight because of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *Stone*, 608 F.3d at 945.

Having found that Defendant has rebutted the presumption in favor of detention, the Court next considers whether the United States has satisfied its burden of persuasion. Section 3142(g) delineates four factors for courts to consider in order to determine whether the government has satisfied its burden:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence, … a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) The weight of the evidence against the person;

(3) The history and characteristics of the person, including –

    (A) The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) Whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) The nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). A court's consideration of these factors should not be construed to modify or limit the defendant's presumption of innocence. *Id.* § 3142(j).

### a. Factors 1, 2, and 4

First the Court considers the "nature and circumstances of the offense charged," which weigh heavily in favor of detention. 18 U.S.C. § 3142(g)(1) specifically directs the Court to consider whether the charged offense "involves . . . a controlled substance" or a "firearm." Defendant is charged with shooting Donald Mills during the course of a drug trafficking crime. [R. 1] This factor therefore weighs in favor of detention.

Next, the Court considers the "weight of the evidence" against the defendant. 18 U.S.C. § 3142(g)(2). This factor relates to the weight of the evidence of a defendant's dangerousness, not the weight of evidence of his guilt. *Stone*, 608 F.3d at 948 (citation omitted). The fourth § 3142(g) factor similarly requires the Court to consider the "nature and seriousness of the

danger to any person or the community that would be posed by the person's release." 18 U.S.C.

§ 3142(g)(4).

With respect to these three factors, the Court notes that the legislative history of the Bail

Reform Act specifically addresses the nature of the presumption in the context of accused drug

traffickers. The Senate Report characterizes the presumption as imposing a "strong probability"

that "no form of conditional release will be adequate." S. Rep. No. 98-225, at 19 (1983),

reprinted in 1984 U.S.C.C.A.N. 3182, 3202. Further, as the Senate Judiciary Committee has

explained, offenses like those charged in this case,

> are serious and dangerous federal offenses. The drug offenses involve either
> trafficking in opiates or narcotic drugs . . . . It is well known that drug trafficking is
> carried on to an unusual degree by persons engaged in continuing patterns of
> criminal activity. Persons charged with major drug felonies are often in the business
> of importing or distributing dangerous drugs, and thus, because of the nature of the
> criminal activity with which they are charged, they pose a significant risk of pretrial
> recidivism.

*Id.* at 20, 1984 U.S.C.C.A.N. at 3203 (emphasis added). Additionally, the "danger"

contemplated by the Act extends beyond physical harm to encompass the societal and economic

perils posed by drug trafficking. *See id.* at 12–13, 1984 U.S.C.C.A.N. at 3195–96 (stating that

"safety" is to mean more than "physical violence" and extends to "nonphysical harms;" further,

"the risk that a defendant will continue to engage in drug trafficking constitutes a danger to the

'safety of any other person or the community'").

For purposes only of this analysis under § 3142(g), the Court notes that the charge in this

matter is well-supported. As Special Agent Tremaine explained, Defendant's drug abuse and

trafficking of oxycodone permeate the events leading up to the shooting of Mills. This trafficking

and abuse are generally dangerous, as explained above, and in this case, that danger escalated

into an armed robbery and deadly shooting. Notably, three minors were present in Mills's home

at the time of the robbery and shooting. The corroborating statements of multiple witnesses directly implicate Defendant in the robbery and shooting of Mills. Further, forensic analysis of the firearm and its serial number link Defendant to the shooting. Moreover, while Defendant was acquitted of murder, and notwithstanding his later pardon, a jury of his peers found him guilty of reckless homicide, first-degree robbery, impersonating a peace officer, and tampering with physical evidence. Though not dispositive, the Court of Appeals of Kentucky later described the proof against Defendant as "overwhelming." *Baker*, 2018 WL 6721295 at \*3.

Notably, nothing can overcome the presumption of innocence at this stage of the proceedings. 18 U.S.C. § 3142(j). The elements of the current federal charge obviously differ from the elements of the state crimes of conviction, and the Court makes no assessment of Defendant's guilt of the underlying crimes. Rather, the Court evaluates the proof in this matter *as to dangerousness*.[3] Here, the evidence indicates that Defendant was involved in an armed drug trafficking scheme, during which a man was fatally shot. The risk of serious, violent, drug-related conduct is grave (and even more so given the new evidence presented at the June 22, 2021 hearing). The pardon Defendant received from former Governor Bevin on his state court convictions in no way mitigates the danger risks. In sum, the Court finds that the first, second, and fourth factors of § 3142(g) weigh heavily in favor of detention.

### b. Factor 3

Turning to the third factor, the Court considers the defendant's history and characteristics. At the detention hearing, United States Probation Officer Brittney Crisp was called by the defense to testify. Both her testimony and the PSR and PSR Addendum in this case

---

[3] At the detention hearing on June 4, 2021, the defense argued that the evidence could not go to both guilt and dangerousness. The Court agrees with the Magistrate Judge that this is a preposterous argument. Obviously, evidence can have many purposes and uses. In this case, Special Agent Tremaine's testimony supports the charged offense and the danger component under section 3142(g)(2).

weigh in favor of release. First, Defendant has lived in Kentucky for most of his life. He appears to have a loving family and he speaks to his parents and siblings on a daily or weekly basis. He also appears to have a stable home environment, including a fiancé and an infant child. Since his child's birth, he has remained at home as a stay-at-home father. He has a history of substance abuse and addiction, but there is no evidence of drug use or other misconduct after his December 2019 pardon. Further, prior to 2017 and despite the seriousness of his addiction, his criminal history lacks some of the significant convictions that so often follow substance abuse.

At the time of the June 4, 2021 detention hearing, the evidence of record reflected full compliance with the terms of Defendant's pretrial release in the state court proceeding while facing a murder charge. At that time, there was no evidence in the record of any misbehavior whatsoever since May 2014. The Magistrate Judge's analysis relied heavily upon the evidence of Defendant's compliance for several years while on pretrial release in state court. The Magistrate Judge explained that compliance or non-compliance with court-ordered conditions of release is perhaps the most probative evidence of predicted future compliance. The Court agrees.

However, as explained in more detail above, the United States has now presented evidence that Defendant violated the terms of his pretrial release by engaging in daily oxycodone use, for almost the entirety of his state court pretrial release. The Court finds Ms. Turner's testimony pivotal on this issue. The Court heard Ms. Turner's testimony and observed her demeanor. She was credible and even implicated herself in drug abuse during the time period about which she testified. She appeared to have no "ax to grind" and affirmed the nice things she said about Defendant in her July 2018 letter to the governor in support of Defendant's pardon. Further, the Court believed Ms. Turner when she testified that she did not "offer up" this testimony to the government agents on June 14, 2021, but rather disclosed it only when they

specifically inquired about Defendant's pretrial drug use, further adding to her credibility. Finally, the fact that Defendant tested negative for illegal substances in the summer of 2014 does not undercut Ms. Turner's testimony. She testified that the drug abuse began in late 2014, and Defendant was not drug tested after July 2014.

The Court cannot ignore this evidence, particularly because Defendant's oxycodone abuse in 2014 precipitated an armed robbery and a fatal shooting. Stated another way, the drug that Defendant abused while on pretrial release from late 2014 until his conviction in 2017 is the very drug that led to his state court convictions and the death of Donald Mills. The Court must acknowledge the risk that Defendant would again violate the terms of his release, abuse controlled substances, and possibly commit additional dangerous crimes. On this point, the Court understands that Defendant's previous period of pretrial release is otherwise unmarred; there is no evidence of other misbehavior during that time. Further, there are no allegations of misconduct occurring after Defendant's 2019 pardon. However, the fact that Defendant engaged in daily substance abuse for nearly three years but did not commit any other known crimes during that time, or since his pardon, does not outweigh the serious circumstances surrounding the underlying offense or the obvious risks posed by future drug abuse. Further, the Court notes that Defendant concealed his 2014–2017 drug use because, as recently as June of this year, Defendant lied to his probation officer about his pretrial drug use, claiming he has been drug free since 2014.

As stated above, the Court believes that past compliance with the terms of pretrial release is a strong indicator of future compliance. *See generally United States v. Ellison*, 2020 WL 7073170, *4 (E.D. Mich. Dec. 3, 2020) ("As to Defendant's risk of non-appearance, the Court cannot ignore Defendant's eighteen past probation violations. Even recognizing that Defendant

has not missed any prior court appearances, the Court ultimately finds that Defendant's repeated behavior of violating supervised released conditions is of great concern for Defendant's future conduct to follow directives from Pretrial Services."). In this case, the Court finds that the evidence of Defendant's violations of the terms of his pretrial release—namely, the daily use of controlled substances—is a strong predictor that he would similarly violate his conditions of pretrial release in this case. Undoubtedly, there are facts in Defendant's background militating in favor of release. But given the dangerousness and circumstances surrounding the underlying crime, which resulted in the death of Donald Mills, the general dangerousness stemming from substance abuse, and the evidence that Defendant violated his state pretrial release almost on a daily basis, the Court finds that no conditions of release could reasonably assure the safety of others and the community.

The United States must persuade the Court by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community, or it must persuade the Court by a preponderance of the evidence that no conditions can reasonably assure the defendant's appearance in future proceedings. 18 U.S.C. § 3142(e)–(f). For the foregoing reasons, the Court agrees with the Magistrate Judge that the defendant produced sufficient evidence to overcome the presumption in this case, but finds that the United States has demonstrated by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of . . . the community" and that detention is therefore necessary. 18 U.S.C. § 3142(e)(1).

### III.    CONCLUSION

Pursuant to 18 U.S.C. § 3145, the Court has conducted a de novo review of the Magistrate Judge's decision to release Defendant. In conducting its review, the Court has

exercised its discretion to consider the new evidence presented at the June 22, 2021 hearing. Based on its thorough review of the record in this matter, including the evidence from Ms. Turner, the Court finds that no condition or series of conditions can reasonably assure the safety of others and the community. Accordingly,

**IT IS HEREBY ORDERED** as follows:

1. The Magistrate Judge's Findings and Statement of Reasons for Release as to Patrick Baker, [**R. 20**], is **REVOKED**.

2. Defendant Patrick Baker **SHALL** remain in custody pending trial.

3. The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

This the 1st day of July, 2021.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY